UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

**CRIMINAL ACTION NO. 4:06CR-20-M**

**UNITED STATES OF AMERICA**                                                               **PLAINTIFF**

**VS.**

**JONATHAN FUGATE, et al.**                                                               **DEFENDANTS**

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on a motion by Defendant, Jonathan Fugate, to suppress [DN 69] and on motions by Defendants, Richard Baize and Abiel Perez, to join in the motion to suppress [DN 70, DN 75, DN 76]. A hearing was conducted on December 7, 2006. The parties have filed post-hearing memoranda [DN 74, DN 78, DN 80]. Fully briefed and argued, this matter is ripe for decision. For the reasons set forth below, the motion to suppress is denied.

**BACKGROUND**

Since March of 2004, DEA Special Agent Daren Atkins has been involved in an ongoing methamphetamine investigation that resulted in two previous indictments. As a result of this investigation, Agent Atkins obtained information regarding the participation of Richard Baize, Abiel Perez, and other co-defendants in a methamphetamine distribution operation. [See Atkins Grand Jury Testimony, Exhibit 5].

On February 23, 2006, Agent Atkins met with a confidential informant who provided independent information about a methamphetamine distribution operation involving Jonathan

Fugate. The information provided by the confidential informant was consistent with information obtained during Agent Atkins's ongoing methamphetamine investigation involving Baize and Perez. The confidential informant informed Agent Atkins that Fugate was affiliated with Richard Baize, had fronted her methamphetamine on consignment, and that Fugate was expecting payment of $2,000 toward the methamphetamine on February 23, 2006. Under Agent Atkins direction, the confidential informant met with Fugate and paid him. The conversation was recorded. Over the next few days, the confidential informant spoke with Fugate, Baize and Perez regarding details of the methamphetamine operation, who was involved, and when the next shipment of methamphetamine would be arriving. Specifically, the confidential informant gathered information that Fugate, Baize and Perez were going to drive to Atlanta on February 26, 2006 to pick up two pounds of methamphetamine. Additional recordings of these conversations were made on February 24 and February 25, 2006.

Based upon this information, Agent Atkins, along with law enforcement officers from the Hopkins County Sheriff's Office, Madisonville Police Department, and Vanderburg County Sheriff's Department, set up surveillance at the residence of Fugate in Nortonville, Kentucky, and waited for Fugate's blue and white van to arrive. Agent Atkins testified that the confidential informant provided ongoing information, including contacting one of the co-defendants during the return trip to get an estimated time of arrival of 9:00 p.m.

Consistent with the information provided by the confidential informant, the blue and white van arrived. After the van stopped in the driveway of the residence, Agent Atkins and

other law enforcement officers surrounded the van and removed Fugate, Baize, Perez, and a fourth individual at gunpoint from the vehicle. Agent Atkins testified that the occupants were Mirandized and placed in separate vehicles. During this initial encounter, Agent Atkins asked Defendant Fugate to consent to the search of his vehicle. Fugate refused. Shortly thereafter, Detective Mike Lantrip left the scene to apply for a search warrant. K-9 Officer Jerry Robards arrived at the scene with his dog. According to Officer Robards, the dog conducted an exterior sniff of the vehicle and alerted to the presence of a controlled substance. After the dog's alert, Officer Robards testified that he opened the van door and let the dog inside, where the dog again alerted to the presence of controlled substances. During the search, the dog knocked over a wicker basket in the van and spilled the contents just outside the sliding door. In the basket, Officer Robards found some vials and a baggie containing 6.8 grams of methamphetamine.

After the methamphetamine was discovered in the van, one of the officers contacted Joel Elliot, Fugate's parole officer. The officer informed Elliot that methamphetamine had been found in the van and that Fugate was detained. Elliot contacted his supervisor, Bruce Hewell. Hewell and Elliot then drove to the residence. Elliot testified that he did not have authority to go to the scene or conduct a search without his supervisor's approval. After arriving at the scene, Hewell and Elliot spoke to law enforcement who informed them that methamphetamine had been located in the van and Fugate was detained. Hewell made the decision to do a walk-through search of the residence. Elliot testified that he spoke to Fugate, told him he was going to search the house, and Fugate voluntarily gave him the keys

to residence. Elliot and Hewell, followed by Agent Atkins and other officers, then entered the residence for a walk-through where Elliott found a glass pipe and evidence of drug use.

Detective Atkins testified that at this time Detective Lantrip was in the process of applying for a search warrant for the van and residence. According to Agent Atkins, although Detective Lantrip had most of the information, he updated his affidavit to include the information from the K-9 officer and the parole officer. After Detective Lantrip obtained the search warrant, the officers searched the car and residence. In the van, the officers seized one pound of methamphetamine and numerous drug related items. In the residence, the officers seized cash, financial documents, surveillance cameras, computers, ammunition, methamphetamine, and other drug related items.

Toward the end of the search, Agent Atkins placed Defendants Fugate and Baize together in the back of a police cruiser. Unbeknownst to Fugate and Baize, officers had placed a tape recorder in the cruiser with them. After giving Fugate and Baize some time alone, officers removed the tape recorder and transported the Defendants to jail. Agent Atkins testified that on the tape, one of the men asks: "They found it, didn't they?" The other man responds, "Yup."

On May 3, 2006, the Grand Jury returned an Indictment charging the Defendants with conspiracy to distribute 500 grams or more of a mixture or substance containing methamphetamine.

## DISCUSSION

The Fourth Amendment protects an individual from unreasonable searches and

seizures. Defendant Fugate moves to suppress all items seized from his vehicle, his person, and his home on or about February 26-27, 2006. Defendant Fugate argues that law enforcement did not have probable cause to believe that the vehicle contained drugs or that the occupants has committed a crime to justify a stop of his vehicle. Fugate also maintains that his parole officer did not have the authority to search his residence. Finally, Defendant also moves to suppress an audio recording of a conversation between Fugate and Baize made while both were in custody in a police cruiser.

### A. Vehicle Search

Generally, an officer has the authority to search a vehicle incident to a lawful custodial arrest in order to disarm a suspect or preserve evidence of a crime. United States v. Williams, 170 Fed. Appx. 399, 402 (6th Cir. March 2, 2006)(citing New York v. Belton, 453 U.S. 454, 460 (1981)). "[I]n order to be a legitimate search incident to arrest, the custodial arrest does not necessarily have to take place before the search." Williams, 170 Fed. Appx. at 404. A warrantless search that precedes an arrest may be constitutionally valid as long as "(1) a legitimate basis for the arrest existed before the search, and (2) the arrest followed 'quickly on the heels . . . of the challenged search.'" Id. (quoting Rawlings v. Kentucky, 448 U.S. 98, 111 (1980)); see also United States v. Montgomery, 377 F.3d 582, 586 (6th Cir.2004), cert. denied, 543 U.S. 1167 (2005).

In the present case, Agent Atkins had a legitimate basis to arrest Fugate, Baize, and Perez. "[I]t is well-settled that the warrantless arrest of an individual does not violate the Fourth Amendment, as long as officers have probable cause to believe that the individual is

5

committing or has committed an offense." United States v. Ridley, 199 F. Supp. 2d 704 (S.D. Ohio. 2001)(citing Beck v. Ohio, 379 U.S. 89 (1964); United States v. Dotson, 49 F.3d 227 (6th Cir.), cert. denied, 516 U.S. 848 (1995)). See also United States v. Bartholomew, 310 F.3d 912, 919 (6th Cir. 2002), cert. denied, 537 U.S. 1177 (2003). "'To determine whether an officer had probable cause to arrest an individual, we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause.'" United States v. Romero, 452 F.3d 610, 615 (6th Cir. 2006)(quoting Maryland v. Pringle, 540 U.S. 366, 371 (2003)).

At the time of the stop, Agent Atkins knew that the Defendants were part of a methamphetamine trafficking organization. He had specific information about four or five trips involving two to five pounds of methamphetamine each trip. The information was corroborated by other information, including statements of cooperating witnesses, more fully set out in Agent Atkins's grand jury testimony. In addition, Agent Atkins had independent information from a confidential informant that Fugate had fronted the confidential informant some methamphetamine, accepted a $2,000 payment from the confidential informant towards that obligation, and that Fugate, Baize and Perez were arranging for methamphetamine to be transported to Fugate's house on the night in question. In addition, Agent Atkins had tape recordings of Fugate, Baize, and Perez discussing their drug trafficking operations. Clearly, at the time of the arrest, "the facts and circumstances within [Agent Atkins's] knowledge and of which [he] had reasonably trustworthy information were

sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91 (1964). These facts, viewed from the standpoint of an objectively reasonable police officer, support probable cause to arrest Fugate, Baize and Perez for a felony drug offense.[1]

For these reasons, the Court concludes that Agent Atkins had probable cause to arrest Fugate, Baize, and Perez and that the methamphetamine and drug paraphernalia located in the van were seized pursuant to a valid search incident to arrest.

### B. Search of the Residence

When analyzing the validity of a probationary search under the Fourth Amendment, the Court first examines "whether the relevant regulation or statute pursuant to which the search was conducted satisfies the Fourth Amendment's reasonableness requirement. If so, [the Court] then analyze[s] whether the facts of the search itself satisfy the regulation or statute at issue." Id. United States v. Henry, 429 F.3d 603, 608 (6th Cir. 2005)(quoting United States v. Loney, 331 F.3d 516, 520 (6th Cir. 2003) (citations omitted)). Kentucky's probationary search policy provides that "an officer may conduct a warrantless search if he

---

[1]Defendant Fugate argues that the actions of the officers in requesting consent to search the van, utilizing a canine unit, and obtaining a search warrant demonstrate that law enforcement– especially the state law enforcement officers – believed they had no probable cause to search the vehicle. Contrary to Defendant's argument, the test is "not whether the arresting officers themselves believed they had probable cause to act but whether any prudent, trained officer could justifiably believe an offense had been committed." United States v. Cooper, 1 Fed. Appx. 399, 403 (6th Cir. January 10, 2001); see also United States v. Kendricks, 127 Fed. Appx. 836, 843 (6th Cir. April 13, 2005). While the search of the van reveals a "kitchen-sink" approach, the existence of probable cause to arrest in this case is not diminished.

has 'reasonable suspicion that the performance of the search may produce evidence to support [an alleged violation of [Defendant's] parole].'" Henry, 429 F.3d at 609 (quoting Coleman v. Commonwealth, 100 S.W.3d 745, 754 (Ky. 2002)). In determining the constitutionality of this policy, the Sixth Circuit held that Kentucky's probationary search policy is reasonable under the Fourth Amendment. Henry, 429 F.3d at 609.

Since the Sixth Circuit in Henry found the Kentucky probationary search policy reasonable, the question in the present case is whether there was reasonable suspicion to conduct the search. "Reasonable suspicion is based on the totality of the circumstances and has been defined as requiring 'articulable reasons' and 'a particularized and objective basis for suspecting the particular person . . . of criminal activity.'" Id. at 609-610 (citing United States v. Payne, 181 F.3d 781, 788 (6th Cir. 1999)). Parole Officer Elliott had reasonable suspicion to believe that Fugate violated his parole conditions by engaging in illegal drug activities and that evidence of such a parole violation would be found in his residence. Prior to entering the residence, Elliott knew that Fugate had been arrested and that some methamphetamine had been found in his vehicle which was parked in his driveway. Elliott also was aware that Fugate had failed to complete a recommended drug treatment program and failed to show up for his required monthly visits. For these reasons, the Court finds that Elliott had the requisite reasonable suspicion to conduct the search.

Notwithstanding this decision, even if the Court concludes that Elliott's probationary search of the residence violated Fugate's Fourth Amendment rights, the Court would still uphold the search of the residence conducted after Detective Lantrip obtained the search

warrant. If, as Defendant argues, the search warrant included illegally obtained information from the probationary search, the Court "must remove this fact from the affidavit when considering whether there is still sufficient information to establish probable cause to search the vehicle." U.S. v. Davis, 430 F.3d 345, 358 (6th Cir. 2005). Examining the search warrant with the information obtained from the probationary search removed, the Court finds there is sufficient information to establish probable cause for the issuance of a warrant to search Fugate's residence.

### C. Statements

Defendant Fugate argues that the statements made in the cruiser must be suppressed because they were the result of the functional equivalent of interrogation in violation of Miranda v. Arizona.

Under the holding of Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court "specifically forbade the introduction of statements obtained from an accused after custodial interrogation unless he had previously been given specific warnings. Miranda defined custodial interrogation as 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" Stanley v. Wainwright, 604 F.2d 379, 382 (5th Cir. 1979), cert. denied, 447 U.S. 925 (1980)(quoting Miranda, 384 U.S. at 444).

> *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are

9

reasonably likely to elicit an incriminating response from the suspect. Rhode Island v. Innis, 446 U.S. 291, 301-302 (1980).

At the hearing, Agent Atkins testified he advised the Defendants of their Miranda rights when they were initially detained, arrested the Defendants, and at the end of the evening placed Fugate and Baize in the cruiser and hoped that the two would make incriminating statements. In this case, there was no questioning. The Defendants' conversation arose spontaneously while the officers were physically absent. "The [officers'] ruse was not the equivalent of inquiry. Miranda was designed to curb unfair methods of custodial interrogation; it does not protect spontaneous utterances made by detainees mistakenly believing that they will not be overheard nor forbid police, under fifth amendment sanction, from setting snares." Stanley, 604 F.2d at 382. Instead, the actions by the officers "consisted of nothing more than 'those normally attendant to arrest and custody.'" United States v. Fabian, 2005 WL 2043008, *4 (D. Vt. 2005)(quoting Innis, 446 U.S. at 301). Accordingly, the tape recorded conversation did not violate Miranda v. Arizona or Defendants' Fifth Amendment rights. Id. For these reasons, the Court denies Defendant's motion to suppress the recorded conversation of Fugate and Baize.

## CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that the motion by Defendant, Jonathan Fugate, to suppress [DN 69] is **denied**. **IT IS FURTHER ORDERED** that the motions by Defendants, Richard Baize and Abiel Perez, to join in Fugate's motion

to suppress [DN 70, DN 75, DN 76] are **granted**.


cc: counsel of record
US Marshall
US Probation